## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) Suzanne West,<br>(2) Jeremy McMillan,<br>(3) and Ivan Herrera,<br>　　　as representatives of a class of similarly<br>　　　situated persons, and on behalf of the<br>　　　BOK Financial 401(k) Plan,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>(1) BOKF, NA;<br>(2) The Retirement Plan Committee of<br>　　　BOKF, NA;<br>(3)　and Cavanal Hill Investment<br>　　　Management, Inc.,<br><br>　　　　　Defendants. | Case No. 4:20-cv-00101-JED-FHM<br><br><br><br><br>**CLASS ACTION COMPLAINT** |

## NATURE OF THE ACTION

1.　　　Plaintiffs Suzanne West, Jeremy McMillan, and Ivan Herrera ("Plaintiffs"), as representatives of the Class described herein, and on behalf of the BOK Financial 401(k) Plan (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"), against Defendants BOKF, NA ("BOK"); The Retirement Plan Committee of BOKF, NA (the "Committee"); and Cavanal Hill Investment Management, Inc. ("Cavanal Hill") (collectively, "Defendants"). As described herein, Defendants have breached their fiduciary duties and engaged in other unlawful conduct to the detriment of the Plan and its participants and beneficiaries. Plaintiffs bring this action to recover all losses caused by Defendants' unlawful conduct, prevent further similar conduct, and obtain other relief as provided by ERISA.

1

## PRELIMINARY STATEMENT

2.       Americans have approximately $6.5 trillion invested in private sector defined contribution retirement plans, such as 401(k) and 403(b) plans. Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations. Only around 8% of non-union U.S. workers in the private sector participate in a defined benefit plan.

3.       The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a traditional defined benefit plan, each participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized. In this scenario, the employer determines how to invest the plan's assets and bears all risk related to excessive fees and investment underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). The employer has every incentive to avoid unnecessary expenses and remove imprudent investments.

4.       Defined contribution plan benefits are not so secure. In a defined contribution plan, participants' retirement benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). The employer controls the investments that will be offered, yet the employees bear all risk related to excessive fees and investment underperformance. The employees do not have the benefit of an employer obliged to fund any shortfall due to cost overruns or poor investment performance.

5.       For financial services employers like BOK, the potential for imprudent and disloyal conduct is especially high. Not only do the Plan's fiduciaries lack a direct incentive to prudently vet investment options and minimize costs, Defendants can benefit the company by retaining high-

cost proprietary investment products that a disinterested fiduciary would avoid or remove under the same circumstances.

6.      To safeguard retirement plan participants, ERISA imposes strict fiduciary duties of loyalty and prudence upon plan sponsors and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *In re Williams Companies ERISA Litig.*, 271 F. Supp. 2d 1328, 1341 (N.D. Okla. 2003) (citation omitted). Fiduciaries must act "solely in the interest of the participants and beneficiaries", 29 U.S.C. § 1104(a)(1)(A), and with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

7.      Defendants have failed to administer the Plan in the interest of participants and failed to employ a prudent process for managing the Plan. Instead, Defendants manage the Plan for the benefit of BOK at the expense of Plan participants. Defendants employ BOK and its subsidiary, Cavanal Hill, to manage key investment options for Plan participants: the target-date funds and the capital preservation option (among others). These investment options are designed for the least sophisticated, and thus most vulnerable, participants in the Plan. Yet BOK's proprietary funds are not products that a disinterested fiduciary would choose. BOK's proprietary funds are excessively-priced for the large plan market, and the performance of those funds does not make up for the higher price that participants must pay. Plan participants would have been far better off with typical non-proprietary alternatives used by peer plans.

8.      These defects also applied to BOK's proprietary international equity fund retained as an option in the Plan.  The costs and performance of this option did not justify its inclusion in the Plan's menu, and Defendants appear to have retained it for the sole purpose of collecting fees for BOK and Cavanal Hill from the Plan.

9.    No other ERISA-governed defined contribution plan similar in size to the Plan offers BOK's proprietary funds. Indeed, the Plan is more than 6 times larger than BOK's next largest customer which, not coincidentally, is another employer under common control with BOK.

10.    In retaining inferior proprietary funds, Defendants appear to act as mere patrons of the company, rather than fiduciaries concerned for the best interest of participants. Defendants' self-interested and imprudent conduct has cost the Plan millions of dollars in excessive fees and lost investment returns during the class period

11.    Based on this conduct and the other conduct alleged herein, Plaintiffs assert a claim against Defendants for breach of their fiduciary duties of loyalty and prudence (Count One) and against BOK for failing to properly monitor the Committee and its members (Count Two).

## JURISDICTION AND VENUE

12.    Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of a plan to remedy breaches of fiduciary duties and other unlawful conduct in violation of ERISA, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

13.    This case presents a federal question under ERISA, and this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

14.    Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the District where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

### PLAINTIFFS

15.     Plaintiff Suzanne West (Plaintiff West) resides in Tulsa, Oklahoma, and participated in the Plan during the class period (see *infra*, ¶ 76). Plaintiff West's account was invested in BOK's proprietary funds. Plaintiff West has been financially injured by Defendants' unlawful conduct as described herein and is entitled to receive benefits in the amount of the difference between the value of her account at the time it was distributed and what her account would have been worth at that time had Defendants not violated ERISA.

16.     Plaintiff Jeremy McMillan resides in Claremore, Oklahoma, and participated in the Plan during the class period (see *infra*, ¶ 76). Plaintiff McMillan's account was invested in BOK's proprietary funds. Plaintiff McMillan has been financially injured by Defendants' unlawful conduct as described herein and is entitled to receive benefits in the amount of the difference between the value of his account at the time it was distributed and what his account would have been worth at that time had Defendants not violated ERISA.

17.     Plaintiff Ivan Herrera resides in Glenpool, Oklahoma, and participated in the Plan during the class period (see *infra*, ¶ 76). Plaintiff Herrera's account was invested in BOK's proprietary funds. Plaintiff Herrera has been financially injured by Defendants' unlawful conduct as described herein and is entitled to receive benefits in the amount of the difference between the value of his account at the time it was distributed and what his account would have been worth at that time had Defendants not violated ERISA.

### THE PLAN

18.     The Plan was originally established effective January 1, 1967. The Plan is a "defined contribution plan" under 29 U.S.C. § 1002(34) and a qualified plan under 26 U.S.C. § 401—a "401(k) plan." The Plan is administered in Tulsa, Oklahoma (Tulsa County).

19.     The Plan covers eligible employees of BOK and certain subsidiaries and affiliates. Participants' accounts are funded through their own contributions. In addition, participants receive matching contributions from BOK.

20.     The Plan had approximately $630 million in assets and 6,444 participants with account balances at the end of 2018, the most-recently reported year.  At all times since the end of 2013, the Plan has had more than $400 million in assets and more than 5,000 participants with account balances. The Plan is therefore one the of largest 1,700 defined contribution plans in the country, out of more than 660,000 such plans. *See Private Pension Plan Bulletin* (Sept. 2019), at 12,  *available  at*  https://www.dol.gov/sites/dolgov/files/EBSA/researchers/statistics/retirement-bulletins/private-pension-plan-bulletins-abstract-2017.pdf (hereinafter "*Plan Bulletin*").

21.     The Plan includes a capital preservation option, a target-date option, BOK Financial Corp. stock, and up to 15 additional options, which are generally pooled funds that invest in a single asset class (i.e., short-term bonds, mid-cap value stocks, etc.).

22.     The Plan is the only retirement benefit currently offered to employees of BOK. The BOK defined benefit plan (traditional pension) was "frozen" in March 2006, with no service accruals for employees after that date.

## DEFENDANTS

### *BOK*

23.     Defendant BOK is headquartered in Tulsa, Oklahoma. BOK is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B) and has ultimate power and decision-making responsibility over the Plan. BOK "holds and manages" the assets of the Plan, according to the Plan's annual Department of Labor filings. BOK also appoints and monitors the members of the Committee (see *infra*, ¶ 24), and maintains a proprietary bank collective investment trust (the

Managed Allocation Portfolio Pooled Investment Trust or "MAP CIT") through which a portion of the Plan's assets are invested, including the Plan's target-date funds. As a result of these powers and duties, BOK exercises discretion and control over the administration and management of the Plan, and over the disposition of the Plan's assets, and is therefore a fiduciary of the Plan under 29 U.S.C. § 1002(21)(A).

### The Committee

24.     Defendant BOK has designated the Committee the "administrator" of the Plan pursuant to 29 U.S.C. § 1002(16)(A). As the Plan Administrator, the Committee is a fiduciary of the Plan. *See* 29 C.F.R. § 2509.75-8 at D-3. In addition, Defendant BOK delegated to the Committee the duty to determine the appropriateness of the Plan's investment offerings and monitor the investment performance of those options. In discharging this duty, the Committee exercises discretionary authority and control over the management of the Plan and the disposition of the Plan's assets, and is therefore a fiduciary of the Plan under 29 U.S.C. § 1002(21)(A). The members of the Committee include senior employees of BOK.

### Cavanal Hill

25.     Defendant Cavanal Hill is a wholly-owned subsidiary of Defendant BOK. Cavanal Hill regularly provides investment advice to Defendant BOK regarding how to invest Plan assets held in the MAP CIT, including the target-date funds. Cavanal Hill receives fees, directly or indirectly, for its advice in connection with the Plan, and BOK relies on Cavanal Hill's advice in executing investment decisions on behalf of the Plan through the MAP CIT. In discharging these duties, Cavanal Hill exercises discretionary authority and control over the management of the Plan and the disposition of the Plan's assets, and is therefore a fiduciary of the Plan under 29 U.S.C. § 1002(21)(A).

## BACKGROUND

### ERISA FIDUCIARY DUTIES

26.     ERISA imposes strict fiduciary duties of loyalty and prudence upon Defendants.

29 U.S.C. § 1104(a)(1) states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A)     For the exclusive purpose of
>
> (i)     Providing benefits to participants and their beneficiaries; and
>
> (ii)     Defraying reasonable expenses of administering the plan;
>
> (B)     With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

These fiduciary obligations are considered "the highest known to the law." *LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (quoting *Donovan*, 680 F.2d at 272 n.8); *see also In re Williams Companies ERISA Litig.*, 271 F. Supp. 2d at 1341 (quoting with approval).

27.     "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000) (citation and internal quotation marks omitted). This duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). Thus, "in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating to the interests of plan participants and beneficiaries . . . . A decision to make an investment may not be influenced by [other] factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL

222716, at *3 (Dec. 19, 1988) (emphasis added).

28.   In addition to this overarching duty of loyalty, the duty of prudence "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (citation and internal quotation marks omitted). An ERISA fiduciary "has a continuing duty to monitor trust investments and remove imprudent ones" that "exists separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble*, 135 S. Ct. at 1828. If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (citation and internal quotation marks omitted). Moreover, fiduciaries are required to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007); *see also* Restatement § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function.").[1] Indeed, this is a point of emphasis under applicable trust law:

> [T]he duty to avoid unwarranted costs is given increased emphasis in the prudent investor rule. This is done to reflect the importance of market efficiency concepts and differences in the degrees of efficiency and inefficiency in various markets. In addition, this emphasis reflects the availability and continuing emergence of modern investment products, not only with significantly varied characteristics but also with similar products being offered with significantly differing costs. The duty to be cost conscious requires attention to such matters as the cumulation of fiduciary commissions with agent fees or the purchase and management charges associated with mutual funds and other pooled investment vehicles. In addition, active management strategies involve investigation expenses and other transaction costs ... that must be considered, realistically, in relation to the likelihood of increased return from such strategies.

---

[1] The legal construction of an ERISA fiduciary's duties is "derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828 (citation and internal quotation marks omitted). Therefore "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Id.; see also Holdeman*, 572 F.3d at 119 ("ERISA incorporates the common law of trusts[.]") (quotation marks and citation omitted); *In re Williams Companies ERISA Litig.*, 271 F. Supp. 2d at 1341 ("ERISA fiduciary duties are drawn from the common law of trusts[.]").

Restatement (Third) of Trusts ch. 17, intro. note (2007).

### DUTIES AS APPLIED TO DEFINED CONTRIBUTION PLANS

29.     Plan participants in a defined contribution plan may invest in any of the options in their plan's menu.[2] However, the fact that participants exercise "independent control" over the assets in their account "does not serve to relieve a fiduciary from its duty to prudently select and monitor any…designated investment alternative offered under the plan." 29 C.F.R. § 2550.404c-1(d)(2)(iv). "[A] fiduciary must initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007). "[A] fiduciary cannot free himself from his duty … by arguing that other funds … could theoretically, in combination, create a prudent portfolio." *Id.*

30.     Every pooled investment product that is made available through a plan charges certain fees and expenses that are paid by deductions from the pool of assets in transactions that typically occur on a monthly or quarterly basis. For example, within each of the BOK-affiliated options in the Plan, fees were deducted regularly and paid to Defendants and other sub-advisers selected by BOK. Under ERISA, the fiduciaries of the plan must ensure that the compensation paid for these investments is reasonable. *See* 29 U.S.C. § 1104(a)(1)(1)(A)(ii) (identifying one of duties of fiduciaries as "defraying reasonable expenses" of administering the plan); *supra* at ¶ 26.

---

[2] Each investment option within a defined contribution plan is generally a pooled investment product offering exposure to a particular asset class or sub-asset class, or a blend of asset classes. The broad asset classes generally include fixed investments ("capital preservation"), bonds, and equities. Money market funds, guaranteed investment contracts, and stable value funds are examples of capital preservation options. Bonds are debt securities, which are generally categorized by the issuer/borrower (U.S. Government, foreign governments, municipalities, corporations), the duration of the debt (repayable anywhere between 1 month and 30 years), and the credit risk associated with the particular borrower. Equity (or "stock") investments obtain ownership shares of companies in anticipation of income from corporate dividends or appreciation in the value of the company. Equity funds are generally categorized by the size of the company (large cap, mid cap, small cap) and the geographic location (domestic, international).

## DUTIES AS APPLIED TO COLLECTIVE TRUSTS

31.     Collective investments trusts (CITs) are a type of pooled investment like mutual funds.[3] However, as a condition of exemption from federal securities laws that regulate mutual funds, CITs are only available to employee benefit plans. *See* 45 Fed. Reg. 8960, 8971-75 (Feb. 11, 1980). Moreover, the operator of a CIT must be a bank or trust company that exercises fiduciary powers under supervision of federal or state banking regulators. *See id.* at 8973.

32.     ERISA treats assets held in CITs as "plan assets". *See* 29 C.F.R. § 2510.3-101(h)(1)(ii). This creates an additional layer of fiduciary responsibility compared to mutual funds. Not only are the plan fiduciaries who set the investment menu obligated to act prudently and loyally in retaining a CIT option, *see Reetz v. Lowe's Companies, Inc.*, 5:18-cv-75, 2019 WL 4233616, at *6 (W.D.N.C. Sept. 6, 2019) (finding a "plausible inference that the process for selecting or monitoring the [CIT] Fund was deficient."), the CIT operator and adviser also are obligated to satisfy fiduciary standards in retaining the underlying investments of the CIT. *See Nelsen v. Principal Glob. Inv'rs Tr. Co.*, 362 F. Supp. 3d 627, 641 (S.D. Iowa 2019) (CIT operator and adviser "not excuse[d] … from their obligation to act prudently in monitoring the underlying investments of the … CITs."), *reconsideration denied*, 2019 WL 7496779 (S.D. Iowa Sept. 23, 2019).

33.     As discussed below, the target date funds in the Plan were held within a CIT structure rather than a mutual fund structure.  This creates a separate and independent set of fiduciary duties with respect to these investments.

---

[3] In general, CITs are able to operate at lower cost than mutual funds and have therefore gained traction among large 401(k) plans. *See Collective Investment Trusts Versus Mutual Funds* (Feb. 8, 2017), *available at* https://www.planadviser.com/collective-investment-trusts-versus-mutual-funds/ (hereinafter "*CITs Versus Mutual Funds*").

### TARGET-DATE FUNDS

34.     Target-date funds provide exposure to a variety of asset classes, primarily equity and fixed income securities, with an investment mix that changes to become more conservative as the fund's target date approaches. Target-date funds are generally offered as a suite of funds with target dates staggered 5 to 10 years apart, allowing the participant to choose the target date that aligns with his or her estimated retirement date. Target-date funds (including BOK's proprietary target-date funds) typically use a "fund of funds" structure, meaning that each fund invests in other pooled invested vehicles in proportions determined by the manager of the funds.

35.     Target-date funds are associated with the "set it and forget it" approach to investing by 401(k) plan participants. Participants who invest in a target-date fund typically do not expect to change their selection over time. Instead, participants rely on the investment manager to rebalance the fund and implement a sound investment strategy for their account over their retirement saving horizon.

36.     Defined contribution plans have increasingly relied on target-date funds to provide participants with diversified investment options.  In 2006, just 32% of plans offered target-date funds, but that number jumped to 80% by 2016. *The Brightscope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans* (June 2019), at 37, *available at* https://www.ici.org/pdf/19_ppr_dcplan_profile_401k.pdf (hereinafter "*A Close Look*"). Likewise, the share of defined contribution plan assets invested in target-date funds increased from only 3% to 21% during the same period. *Id.*

37.     In 2013, the "increasingly popular" decision by fiduciaries to offer target-date funds caused the U.S. Department of Labor (DOL), the federal agency tasked with enforcing ERISA, to issue "guidance to assist plan fiduciaries in selecting and monitoring TDFs." *See* DEP'T OF LABOR,

*Target Date Retirement Funds - Tips for ERISA Plan Fiduciaries* (Feb. 2013), *available at* https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds.pdf. The DOL found that target-date funds are "attractive investment options for employees who do not want to actively manage their retirement savings." However, the DOL also found that "considerable differences" exist between target-date fund providers in a highly competitive marketplace. Thus, the DOL emphasized the "important" role fiduciaries play in selecting a target-date product for their plans. *See id.* at 1. In particular, the DOL advised fiduciaries to scrutinize target-date fund fees because "***[s]mall differences in investment fees and costs can have a serious impact on reducing long term retirement savings***" (emphasis added). The DOL also directed fiduciaries to the fact that target-date funds impose layers of fees that must be considered and understood. *See id.* at 2.

**CAPITAL PRESERVATION OPTIONS**

38.     Another common 401(k) menu offering is a low-risk, liquid option designed for capital preservation. Indeed, for plans like the Plan that allow participants to make frequent changes to their investments, offering an "income producing, low risk, liquid" option is necessary to satisfy the requirements of ERISA § 404(c). *See* 29 C.F.R. § 2550.404c-1(b)(2)(ii)(C)(ii).

39.     Several types of investment products offer capital preservation. Money market funds are mutual funds that invest only in very short-term debt securities, with the goal of minimizing liquidity risk and maintaining a stable asset value. Another common capital preservation product in 401(k) plans is a stable value fund. Stable value funds invest in longer duration debt securities than money market funds, as well as other assets, and therefore offer higher income potential. To protect against loss, an investor's principal is covered by a contract with an insurer, which also helps smooth out investment losses and gains to achieve stability and liquidity

similar to money market funds. As of the end of 2016, around 1.9% of 401(k) money was invested in money market funds, while around 8.9% was invested in insurance-based capital preservation products like stable value funds. *See A Close Look*, at 36.

40.     Because stable value funds offer the benefits of money market funds with higher yield potential, experts have long touted the superiority of stable value funds for capital preservation in defined contribution plans. *See* Paul J. Donahue, *Plan Sponsor Fiduciary Duty for the Selection of Options in Participant-Directed Defined Contribution Plans and the Choice Between Stable Value and Money Market*, 39 AKRON L. REV. 9, 20–27 (2006) ("The choice of a Money Market Fund instead of a Stable Value Fund meaningfully decreases Participant wealth and is a clear violation of a Plan Sponsor's duty to select options as a prudent expert.").

41.     The choice became even more stark after the 2008 financial crisis, as money market fund yields retracted to close to zero and remained there until 2016, often failing to keep pace with inflation. During the same period, stable value funds consistently generated meaningful returns with no loss of principal. *See* Chris Tobe, CFA, *Do Money-Market Funds Belong in 401(k)s?*, MarketWatch (Aug. 30, 2013), *available at* http://www.marketwatch.com/story/do-money-market-funds-belong-in-401ks-2013-08-30 ("With yields hovering around 0%, money-market funds aren't a prudent choice for a 401(k)."); Paul J. Donahue, *Stable Value Re-examined*, 54 RISKS AND REWARDS 26, 28 (Aug. 2009), *available at* http://www.soa.org/library/newsletters/risks-and-rewards/2009/august/rar-2009-iss54-donahue.pdf. ("[S]table value participants received point-to-point protection of principal, with no sacrifice of return[.]").

## MARKET SEGMENTATION

42.      Larger 401(k) plans are able to command lower fees. The DOL acknowledged that asset size is an important fiduciary consideration in an early regulation interpreting ERISA's standard of prudence:

> Under the "prudence" rule, the standard to which a fiduciary is held in the proper discharge of his investment duties is defined, in part, by what a prudent person acting in a like capacity and familiar with such matters would do. Thus, for example, it would not seem necessary for a fiduciary of a plan with assets of $50,000 to employ, in all respects, the same investment management techniques as would a fiduciary of a plan with assets of $50,000,000.

44 Fed. Reg. 37221, 37224.

43.      As the large 401(k) marketplace developed, competition has kept costs very low:

> Larger plans enjoy potentially significant economies of scale. In the case of investment expenses, they have access to more providers offering a wide range of investment vehicles at lower cost. Very large plans may be able to reduce investment expenses even more through fee-reduction negotiations with the providers or use of lower-cost institutional accounts.

*See* OFFICE OF POLICY RESEARCH, *Final Report: Study of 401(k) Plan Fees and Expenses* (Apr. 13, 1998), at § 4.4 *available at* https://www.dol.gov/sites/dolgov/files/legacy-files/ebsa/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf; *see also id.* § 3.7 ("[C]ompetition makes the market for large corporation plans very efficient."), *A Close Look* at 46 ("[L]arger plans tend to have lower fees[.]") & 51 (average expense ratios by market segment).

44.      For this reason, the ERISA standard of prudence, as applied to a particular plan, is typically informed by the actions of similarly sized plans. *See, e.g.*, *Tibble v. Edison Intl.*, 07-cv-5359, 2017 WL 3523737, at *5 (C.D. Cal. Aug. 16, 2017) (crediting "unrebutted evidence … that a prudent fiduciary managing a 401(k) plan the size of [the plaintiffs' plan]" would have obtained lower investment fund fees); *Tussey v. ABB, Inc.*, 2:06-CV-04305, 2012 WL 1113291, at *36 (W.D. Mo. Mar. 31, 2012) (typical fee range "for a plan of similar size" showed losses incurred by a plan that paid more), *aff'd in relevant part*, 746 F.3d 327 (8th Cir. 2014).

## DEFENDANTS' VIOLATIONS OF ERISA

I.   **THE COMMITTEE IMPRUDENTLY AND DISLOYALLY RETAINED THE BOK TARGET-DATE FUNDS IN SPITE OF SUPERIOR NON-PROPRIETARY ALTERNATIVES.**

45.   BOK launched its proprietary target-date funds, managed through its MAP CIT product, in 2005. The Committee added the BOK target-date funds to the Plan at inception, before the funds had an established performance record. Despite rapid expansion of the target-date market since that time, the Committee appears to have never revisited its choice of target-date funds for the Plan.

46.   BOK's target-date funds are significantly more expensive than superior alternatives in the large plan market. Indeed, the BOK target-date funds are not even viable in the large plan market, and have been wholly rejected by fiduciaries of other similarly-sized plans.

47.   The Plan stands as an extreme outlier compared to other customers of BOK's target-date funds. In each year from 2014 to 2018 (the most-recently reported year), the Plan was by far the largest ERISA plan invested in the funds, and was 2.7 to 6.7 times larger than the next largest plan invested in those funds. As shown by Illustration 1 below, there was not a single plan with $200 million in assets (other than the Plan) that invested in BOK's target-date funds, and the median plan was consistently more than 100 times smaller than the Plan.

*Illustration 1*

|      | Plan Assets | Next Largest BOK TDF Client | Median BOK TDF Client |
|------|-------------|-----------------------------|------------------------|
| **2014** | $436,931,346 | $158,487,462 | $2,484,216 |
| **2015** | $451,496,294 | $117,877,149 | $3,049,254 |
| **2016** | $520,968,173 | $126,270,575 | $2,991,241 |
| **2017** | $628,544,110 | $155,097,424 | $3,344,878 |
| **2018** | $631,502,675 | $93,991,281[4] | $3,145,660 |

---

[4] In 2018, the second and fourth largest plans invested in BOK's target-date funds were managed by other companies owned by the majority shareholder of BOK's holding company (in other words, three of the top four plans were BOK and affiliates). This further reveals the extent to which BOK's target-date funds were unable to gain traction among disinterested fiduciaries of similarly-sized plans.

48.     A comparison to other products in the marketplace explains why BOK's target-date funds have zero market penetration among the other 3,700 plans with more than $200 million in assets: excessive fees. In 2016 (the most recent year with comprehensive analysis), the average target-date mutual fund expense ratio for plans between $250 million and $1 billion in assets was between 0.45% and 0.49%. *See A Close Look* at 51. For plans with $10 million or less, the average was between 0.64% and 0.81%. *See id.* By comparison, BOK's target-date funds cost 0.88%.[5] In short, BOK's target-date funds charge a small market price, not a large market price, and thus disinterested large market fiduciaries have avoided them.[6]

49.     These comparisons actually <u>understate</u> the excessiveness of the fees for BOK's target-date funds because BOK's target-date funds are not mutual funds.  Instead, they are part of BOK's MAP CIT, a collective trust. While the same comprehensive analysis of fees paid by 401(k) plans is not available for collective trusts as it is for mutual funds (because collective trusts do not have the same public disclosure obligations), reports have shown that CITs "can cost 10 to 30 basis points [0.10% to 0.30%] less than mutual funds with similar features." *See CITs Versus Mutual Funds.*[7] The excessiveness of BOK's fees compared to target-date CITs held by similar plans, and compared to all target-date vehicles held by similar plans, is greater than its excess compared only to mutual funds.

---

[5] Asset-weighted expense ratio for BOK's target-date series in 2016. The net expense ratio for each vintage (2020, 2030, et seq.) varied based on the cost of the underlying assets and other fees assessed by BOK.

[6] By 2019, BOK reduced the cost of its target-date funds to around 0.74%, but this remains well above the average for similarly-sized plans. In the meantime, mutual fund fees in the marketplace have continued to fall. *See Fees Are In Free Fall—and They're Not Stopping* (July 23, 2019) ("Mutual fund fees have been falling for seven years, and the trend isn't slowing."), *available at* https://www.institutionalinvestor.com/article/b1gdcdxtq5rvh0/Fees-Are-In-Free-Fall-and-They-re-Not-Stopping. The Committee's retention of a target-date product in 2019 that remains far more costly than the average target date fund in large plans in 2016 is alarming.

[7] For this reason, there has been a "strong trend among the large plans" to use CITs. *Id.*

50.     Examples of similar products in the marketplace further illustrate the excessiveness of BOK's target-date fund fees. Target-date funds offered by other firms that use a similar collective trust structure and a similar passive/active hybrid model (i.e., a model that includes both actively-managed and passively-managed funds as underlying investments) are half the cost or less than BOK's target-date funds. As shown by Illustration 2 below, these lower-cost alternatives have been retained by dozens of fiduciaries of other large plans, as compared to zero retention of BOK's target-date funds by such plans.

*Illustration 2*

*2060*

| | Net Expense Ratio[8] | Other $200MM+ Plans[9] |
|---|---|---|
| FIAM[10] Blend Target Date 2060 | 0.32% | 40 |
| TRP[11] Retirement Hybrid 2060 | 0.34% | 17 |
| **BOK MAP 2060 Fund** | **0.73%** | **0** |

*2050*

| | Net Expense Ratio | Other $200MM+ Plans |
|---|---|---|
| FIAM Blend Target Date 2050 | 0.32% | 41 |
| TRP Retirement Hybrid 2050 | 0.34% | 18 |
| **BOK MAP 2050 Fund** | **0.74%** | **0** |

*2040*

| | Net Expense Ratio | Other $200MM+ Plans |
|---|---|---|
| FIAM Blend Target Date 2040 | 0.32% | 41 |
| TRP Retirement Hybrid 2040 | 0.34% | 18 |
| **BOK MAP 2040 Fund** | **0.74%** | **0** |

---

[8] Expense ratios for non-proprietary alternatives reflect the rate class held by certain other plans with similar assets to the Plan. The Plan may be eligible for even lower rates based on other factors.
[9] Participating plans are based on the CIT fund's most recent Form 5500 filing. The number reported reflects the number of such participating plans (excluding the Plan) with more than $200 million in year-end assets based on the most recent Form 5500 filings by the plans.
[10] Fidelity Institutional Asset Management.
[11] T. Rowe Price.

*2030*

|  | Net Expense Ratio | Other $200MM+ Plans |
|---|---|---|
| FIAM Blend Target Date 2030 | 0.32% | 42 |
| TRP Retirement Hybrid 2030 | 0.34% | 18 |
| **BOK MAP 2030 Fund** | **0.74%** | **0** |

*2020*

|  | Net Expense Ratio | Other $200MM+ Plans |
|---|---|---|
| FIAM Blend Target Date 2020 | 0.32% | 42 |
| TRP Retirement Hybrid 2020 | 0.34% | 18 |
| **BOK MAP 2020 Fund** | **0.74%** | **0** |

*2010*

|  | Net Expense Ratio | Other $200MM+ Plans |
|---|---|---|
| FIAM Blend Target Date 2010 | 0.32% | 42 |
| TRP Retirement Hybrid 2010 | 0.34% | 18 |
| **BOK MAP 2010 Fund** | **0.71%** | **0** |

*Income*[12]

|  | Net Expense Ratio | Other $200MM+ Plans |
|---|---|---|
| FIAM Blend Target Date Income | 0.32% | 44 |
| **BOK MAP Conservative Income Fund** | **0.68%** | **0** |

51.     Net returns over time failed to justify the higher fees paid by the Plan. As shown in

Illustration 3 below, BOK's target-date funds consistently underperformed these lower-cost non-

proprietary alternatives with similar investment objectives and styles. [13] Moreover, the losses were

worst for participants in the 2020 and 2030 funds, whose accounts collectively represent more than

half of the Plan's target-date assets.

---

[12] The TRP Retirement Hybrid target-date series does not include a distinct "income" fund.

[13] BOK's target-date funds also have consistently underperformed accepted target-date benchmarks, the S&P Target Date indexes. For example, the S&P Target Date indexes are used by the TRP Retirement Hybrid series to benchmark fund performance. For each five-year period published by S&P at year-end since 2015, each BOK target-date fund underperformed its applicable S&P Target Date index. All funds except the 2040 fund also underperformed as of year-end 2014. Presumably for this reason, Defendants have eschewed target-date benchmarks in performance statements to participants.

*Illustration 3*[14]

**2050**[15] **– 15% of Plan's Target-Date Assets**

|  | 2013 5-Year | 2014 5-Year | 2015 5-Year | 2016 5-Year | 2017 5-Year | 2018 5-Year | 2019 5-Year |
|---|---|---|---|---|---|---|---|
| FIAM Blend Target Date 2050 | 15.52% | 11.11% | 7.63% | 10.49% | 11.45% | 5.04% | *8.77%* |
| TRP Retirement Hybrid 2050 | 17.34% | 11.88% | 8.58% | *11.22%* | 12.20% | *5.68%* | *9.26%* |
| **BOK MAP 2050 Fund** | **16.52%** | **11.91%** | **7.80%** | **10.07%** | **11.23%** | **4.33%** | **7.71%** |

**2040 – 26% of Plan's Target-Date Assets**

|  | 2013 5-Year | 2014 5-Year | 2015 5-Year | 2016 5-Year | 2017 5-Year | 2018 5-Year | 2019 5-Year |
|---|---|---|---|---|---|---|---|
| FIAM Blend Target Date 2040 | 15.15% | 10.96% | 7.54% | 10.23% | 11.29% | 5.04% | *8.74%* |
| TRP Retirement Hybrid 2040 | *17.27%* | 11.85% | *8.58%* | *11.20%* | *12.12%* | *5.67%* | *9.12%* |
| **BOK MAP 2040 Fund** | **15.73%** | **11.25%** | **7.39%** | **9.39%** | **10.42%** | **4.15%** | **7.39%** |

**2030 – 34% of Plan's Target-Date Assets**

|  | 2013 5-Year | 2014 5-Year | 2015 5-Year | 2016 5-Year | 2017 5-Year | 2018 5-Year | 2019 5-Year |
|---|---|---|---|---|---|---|---|
| FIAM Blend Target Date 2030 | 14.34% | 10.30% | 7.07% | *9.32%* | *10.20%* | *4.98%* | *8.02%* |
| TRP Retirement Hybrid 2030 | *16.56%* | *11.26%* | *8.12%* | *10.50%* | *11.10%* | *5.35%* | *8.42%* |
| **BOK MAP 2030 Fund** | **14.08%** | **10.03%** | **6.50%** | **8.06%** | **8.87%** | **3.87%** | **6.78%** |

---

[14] This illustration examines the annualized net return of each fund over five-year cycles, measured at year-end.  For example, the 2013 five-year cycle starts January 1, 2009 and ends December 31, 2013; the 2014 five-year cycle starts January 1, 2010 and ends December 31, 2014; *et seq.* Darkened cells represent 5-year cycles during which the market alternative outperformed BOK's proprietary fund net of fees. Italicized text represents outperformance of more than 1% per year during the period.

[15] This table starts with the 2050 fund because there is no 5-year period suitable for comparison for the 2060 vintage. FIAM and TRP introduced their 2060 vintages in mid-2015. The TRP 2060 fund has outperformed BOK's 2060 fund each full year since its inception, 2016-2019. The FIAM 2060 fund outperformed in each full year except 2017.

*2020 – 18% of Plan's Target-Date Assets*

|  | 2013 5-Year | 2014 5-Year | 2015 5-Year | 2016 5-Year | 2017 5-Year | 2018 5-Year | 2019 5-Year |
|---|---|---|---|---|---|---|---|
| FIAM Blend Target Date 2020 | 12.75% | 8.99% | 6.11% | *7.74%* | *8.26%* | 4.43% | 6.77% |
| TRP Retirement Hybrid 2020 | *14.97%* | *10.12%* | *7.21%* | *9.09%* | *9.38%* | *4.77%* | *7.33%* |
| **BOK MAP 2020 Fund** | **12.00%** | **8.59%** | **5.43%** | **6.50%** | **7.01%** | **3.53%** | **6.01%** |

*2010 – 2% of Plan's Target-Date Assets*

|  | 2013 5-Year | 2014 5-Year | 2015 5-Year | 2016 5-Year | 2017 5-Year | 2018 5-Year | 2019 5-Year |
|---|---|---|---|---|---|---|---|
| FIAM Blend Target Date 2010 | *11.30%* | 8.01% | *5.49%* | *6.77%* | *6.97%* | 3.93% | 5.66% |
| TRP Retirement Hybrid 2010 | *12.68%* | *8.45%* | *5.93%* | *7.23%* | *7.21%* | 3.96% | *6.06%* |
| **BOK MAP 2010 Fund** | **9.82%** | **7.07%** | **4.36%** | **4.90%** | **5.03%** | **2.98%** | **4.95%** |

*Income – 2% of Plan's Target-Date Assets*

|  | 2013 5-Year | 2014 5-Year | 2015 5-Year | 2016 5-Year | 2017 5-Year | 2018 5-Year | 2019 5-Year |
|---|---|---|---|---|---|---|---|
| FIAM Blend Target Date Income | 7.15% | 5.11% | 3.45% | 4.17% | 4.46% | 3.03% | 4.24% |
| **BOK MAP Cons. Income Fund** | **8.27%** | **6.17%** | **3.83%** | **3.94%** | **4.04%** | **2.64%** | **4.60%** |

52.     A prudent and objective fiduciary in the Committee's position would not have realistically expected the extra fees charged by BOK's target-date funds to result in extra returns compared to available marketplace alternatives. Had the Committee conducted a fair, diligent, and objective review of non-proprietary options, BOK's high-cost target-date funds would have been replaced with an appropriate alternative.[16]

---

[16] The FIAM and TRP series make apt illustrations considering their passive/active approach and collective trust structure in common with BOK; however, they are not the only superior options. As the average fees paid by large plans and other marketplace statistics show (*see supra* at ¶ 48), there are more than a thousand large 401(k) plans that have retained other lower-cost target-date alternatives to BOK's target-date funds. An appropriate fiduciary investigation by the Committee would reveal a marketplace replete with superior lower-cost alternatives.

53.     The only reason that BOK's target-date funds have been retained in the Plan is that it is beneficial to BOK. The Plan's target-date assets represent around 20% of BOK's total target-date assets under management. BOK receives substantial fee revenue from the Plan's target-date investment on multiple levels – the CIT management level (the largest portion of BOK's fees) and through certain underlying Cavanal Hill mutual funds retained as underlying holdings (*see infra* at ¶ 57). Retaining BOK's target-date funds in the Plan avoids loss of this revenue and depletion of critical assets necessary for the target-date funds to achieve basic economies of scale. While this is certainly beneficial to BOK, it is not prudent or in the best interest of the Plan or its participants.

## II.     BOK AND CAVANAL HILL FAILED TO MANAGE THE BOK TARGET-DATE FUNDS IN A LOYAL AND COST-CONSCIOUS MANNER.

54.     BOK and Cavanal Hill failed in their separate fiduciary duty to prudently and loyally monitor the underlying investments of BOK's target-date funds (*see supra* at ¶¶ 28, 32-33). Indeed, the fee excesses and underperformance of BOK's target-date funds are attributable, in part, to these failures. If BOK and Cavanal Hill managed the target-date funds consistent with their fiduciary duties, participants would have experienced higher net investment returns.

### A.     Retention of Inferior Proprietary Funds as Underlying Investments

55.     BOK and Cavanal Hill have retained poorly-performing proprietary mutual funds as underlying holdings of the BOK target-date funds. For example, for an active bond mandate, Defendants have continued to retain the Cavanal Hill Bond Fund, even though this fund has suffered substantial and consistent underperformance. As shown in Illustration 4 below, the Cavanal Hill Bond Fund has underperformed its benchmark index over the preceding five-year period for three straight years.

*Illustration 4*

|  | 2017 5-Year | 2018 5-Year | 2019 5-Year |
|---|---|---|---|
| Bloomberg Barclays US Aggregate Bond Index | 2.10% | 2.52% | 3.05% |
| **Cavanal Hill Bond Fund** | **1.77%** | **1.92%** | **2.38%** |

56.     A prudent and objective fiduciary engaged in appropriate monitoring of the Cavanal

Hill Bond Fund would have investigated potential replacements for this underperforming

proprietary fund. There were multiple superior options available. BOK and Cavanal Hill could

have re-allocated monies to other active bond funds held by the BOK target-date funds, such as

the MetWest Total Return Bond Fund and the PIMCO Income Fund. Alternatively, BOK and

Cavanal Hill could have investigated other active bond funds in the marketplace with similar

strategies to the Cavanal Hill Bond Fund, like the Baird Aggregate Bond Fund or the Western

Asset Core Bond fund. Additionally, BOK and Cavanal Hill could have replaced their

underperforming active fund with a passive fund designed to yield predictable returns close to the

benchmark. Each alternative demonstrated superior performance during the periods that the

Cavanal Hill Bond Fund failed to meet its benchmark and offered better prospects for future returns

for BOK's target-date funds and the Plan.[17]

*Illustration 5*

|  | 2017 5-Year | 2018 5-Year | 2019 5-Year |
|---|---|---|---|
| MetWest Total Return Bond Fund | 2.51% | 2.44% | 3.03% |
| PIMCO Income Fund | *6.36%* | *5.49%* | *5.66%* |
| Baird Aggregate Bond | 2.74% | *2.94%* | *3.43%* |
| Western Asset Core Bond | *3.21%* | *3.45%* | *4.02%* |
| Fidelity US Bond Index Fund | 2.05% | 2.51% | 2.99% |
| **Cavanal Hill Bond Fund** | **1.77%** | **1.92%** | **2.38%** |

---

[17] In addition, each active alternative (MetWest, PIMCO, Baird, and Western Asset) outperformed the Cavanal Hill Bond fund over the preceding five-year cycle at year-end 2016 (2012-2016) and 2015 (2011-2015).

57. No other fiduciary of a large ERISA plan, and no other fiduciary of a fund-of-funds CIT offered in a large ERISA plan, utilizes the Cavanal Hill Bond Fund. Had BOK and Cavanal Hill conducted a diligent and objective investigation of superior alternatives, they would not have retained the Cavanal Hill Bond Fund. The reason to retain it was self-serving and improper: the Cavanal Hill fund paid extra fees to Defendants.[18]

**B.      Exclusive Use of Mutual Funds as Underlying Investments Without Proper Consideration of Less-Expensive Investment Vehicles**

58. BOK and Cavanal Hill also mismanaged the BOK target-date funds by exclusively utilizing mutual funds as underlying investment holdings of the BOK target-date funds and failing to consider lower-cost collective trust versions of the same investments. For a fund-of-funds CIT product like BOK's target-date funds, choosing higher-cost mutual funds as underlying investments defeats the purpose of using a CIT structure in the first instance. Prudently managed fund-of-funds CITs utilize the lowest-cost vehicle available for a desired investment product.

59. As shown in Illustration 6 below, several BOK target-date underlying funds are available from the same managers in lower-cost CITs. Defendants' failure to obtain the lowest-cost vehicle for each underlying investment cost BOK target-date participants unnecessary fees.

---

[18] BOK and Cavanal Hill have utilized other proprietary mutual funds as underlying holdings of the BOK target-date funds. These funds also did not merit inclusion based on their fees and performance relative to the marketplace. The Cavanal Hill Bond Fund is the proprietary fund with the largest allocation from the BOK target-date funds.

*Illustration 6*

| BOK TDF Underlying Mutual Fund | Cost to BOK TDF Participants | Lower-Cost CIT Version of the Same Fund[19] |
|---|---|---|
| American Funds EuroPacific Growth Fund | 0.49% | 0.44% |
| MetWest Total Return Bond Fund | 0.44% | 0.35% |
| T. Rowe Price Blue Chip Growth Fund | 0.57% | 0.35%-0.55% |
| Federated High Yield Fund | 0.50% | 0.45% |

### C.  Failure to Utilize Appropriate Share Classes

60.  BOK and Cavanal Hill not only failed to consider alternatives to mutual funds, they also failed to obtain the lowest-cost shares of mutual funds held within the BOK target-date funds.

61.  Many mutual funds have multiple classes of shares with different levels of fees. Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower-cost share classes are targeted at institutional investors with more assets. There is no difference between share classes other than the cost—the different share classes hold identical investments.  Accordingly, a prudent fiduciary managing or monitoring a fund-of-funds will use its assets and negotiating power to utilize the cheapest share class available.

62.  Yet, as shown by Illustration 7 below, BOK and Cavanal Hill frequently held more expensive share classes of underlying investments within the target-date funds than were necessary. Defendants' failure to obtain the lowest-cost shares available constitutes an additional breach of their fiduciary duties with respect to management of the BOK-target date funds.

---

[19] Expense ratios for CITs are not subject to the same strict public disclosure requirements as mutual funds. CIT managers also offer more flexibility on price and are typically willing to negotiate. The CIT version expense ratios in this column reflect publicly-available information regarding rates offered by the CIT.  As it is not apparent that Defendants have investigated CIT alternatives or attempted to negotiate a price, the precise amount of fee savings that Defendants could obtain for BOK target-date investors is not known at this time.

*Illustration 7*

| BOK TDF Underlying Mutual Fund | BOK TDF Class / Cost[20] | Lower Fee Class / Cost |
|---|---|---|
| MetWest Total Return Bond Fund | I / 0.44% | P / 0.37% |
| Templeton Global Bond Fund | Adv / 0.65% | R6 / 0.52% |
| Mainstay Large Cap Growth Fund | I / 0.74% | R6 / 0.62% |
| Invesco Oppenheimer Developing Markets Fund | Y / 1.07% | R6 / 0.87% |
| JHancock Disciplined Value Mid Cap Fund | I / 0.90% | R6 / 0.78% |
| MSIF Discovery Fund (f/k/a Mid Cap Growth) | I / 0.75% | IS / 0.61% |
| Ivy Asset Strategy | I / 0.73% | R6 / 0.59% |

63.     Given BOK's and Cavanal Hill's mismanagement of the BOK target-date funds, it is no small wonder that the target-date funds charged excessive fees and have been shunned by fiduciaries of other large plans.

## III.   THE COMMITTEE FAILED TO INVESTIGATE AND OBTAIN SUPERIOR CAPITAL PRESERVATION OPTIONS FOR THE PLAN.

64.     In addition to the foregoing fiduciary breaches relating to the Plan's target-date funds, there also were fiduciary breaches relating to the Plan's capital preservation option. Specifically, the Committee failed to investigate alternatives to the Plan's money market fund, such as a stable value fund or other mutual funds from unaffiliated fund companies.

65.     The Plan used to offer a stable value fund. Capital preservation assets were split about evenly between the stable value option and BOK's proprietary money market fund, the Cavanal Hill Government Securities Money Market Fund (f/k/a the Cash Management Fund). But then the stable value fund held by the Plan closed. Instead of investigating other stable value funds and replacing the closed fund with another stable value option, the Committee moved the Plan's

---

[20] This column represents a share class used by BOK and Cavanal Hill in the BOK target-date funds during the statutory period at a time when the lower-fee share class in the adjacent column was available.  In certain cases, the BOK target-date funds belatedly switched to the lower-cost shares.  In other cases, like the MetWest Total Return Fund, Defendants continue to hold the higher-cost shares. Expense ratios and share class designations in this illustration reflect fees and designations in effect when the BOK target-date funds held the more expensive shares.

entire stable value investment to BOK's proprietary money market fund.

66.     The Committee has had years to investigate and obtain another stable value option for Plan participants. Yet the Committee failed to so, and all capital preservation assets in the Plan have remained in the BOK's proprietary money market fund.

67.     The Committee's inaction was not due to any deficiency in the marketplace of available stable value options.  Indeed, the stable value marketplace thrived in the years after the Committee transferred the Plan's stable value assets to BOK's proprietary money market fund. Significantly more 401(k) assets remain in insurance-based capital preservation products than money market funds (*see supra* at ¶ 39), and typical stable value fund performance, as measured by the Hueler Index,[21] continue to eclipse the performance of money market funds. As shown in Illustration 8 below, stable value funds have consistently earned more than BOK's proprietary money market fund (which actually had negative real returns after accounting for inflation).

*Illustration 8*

|  | Hueler Index | Consumer Price Index Average Percent Change (Inflation) | Cavanal Hill Govt Sec MM Fund (f/k/a Cash Mgmt Fund) |
|---|---|---|---|
| 2013 | *1.84%* | *1.5%* | 0.02% |
| 2014 | *1.69%* | *1.6%* | 0.01% |
| 2015 | *1.77%* | 0.1% | 0.01% |
| 2016 | *1.79%* | *1.3%* | 0.11% |
| 2017 | *1.96%* | *2.1%* | 0.63% |
| 2018 | 2.23% | 2.4% | 1.60% |
| 2019 | 2.51% | 2.4% | 1.97% |

---

[21] The Hueler Index is a composite of reported returns for more than a dozen leading stable value funds available in the marketplace, representing more than $100 billion in assets under management.

68.     The reason that the Committee has failed to obtain a stable value replacement appears to be a selfish one: requiring all capital preservation assets in the Plan to be held in BOK's proprietary fund drives more fees to BOK, and BOK does not offer a proprietary stable value fund.

69.     The Committee's self-serving motivation is further underscored by comparing BOK's proprietary money market fund to other available money market funds. Even if the Committee determined that offering only a money market fund was best for participants, the Cavanal Hill fund still would not be a prudent choice. As shown by Illustration 9 below, the marketplace is replete with money market funds that charge lower fees and generate higher yields. Among large ERISA defined contribution plans that offer a money market option, no other plan offers the Cavanal Hill fund.

*Illustration 9*

| | Exp. % | 2019 5-Year Ann. Ret. | Other $200MM+ Plans |
|---|---|---|---|
| Vanguard Federal MM | 0.11% | 1.01% | 612 |
| JPMCB US Govt MM | 0.21% | 0.95% | 22 |
| Wells Fargo Govt MM | 0.20% | 0.94% | 14 |
| **Cavanal Hill Govt Sec MM** | **0.26%** | **0.86%** | **0** |

70.     The Committee's failure to consider alternative capital preservation options has left participants without an appropriate capital preservation option and caused substantial losses to the Plan though lower net income on participants' "safe" investments.

**IV.   THE COMMITTEE IMPRUDENTLY AND DISLOYALLY RETAINED A HIGH-COST PROPRIETARY INTERNATIONAL EQUITY FUND DESPITE SUPERIOR ALTERNATIVES.**

71.     The Committee's conflicted judgment also caused the Plan to retain an inappropriate international equity option. The BOK International Strategic Allocation Fund ("ISA Fund") is another fund, like the BOK target-date funds, managed by BOK and Cavanal Hill through BOK's MAP CIT product. Also like the BOK target-date funds, the ISA Fund is made up

of more than a dozen underlying mutual funds. Together, the ISA Fund's underlying funds cover international stock markets broadly. Participants pay a fee for BOK's and Cavanal Hill's management service, and they also bear the cost of the underlying funds.

72.     The structure and results of the BOK ISA Fund show that it was improper for the Committee to retain this fund as an investment option in the Plan.  The BOK ISA Fund charges excessive fees for the large plan market as a result of retaining primarily active mutual funds as underlying holdings and then adding a significant additional fee on top. The average plan similar in size to the Plan paid only 0.58% for international equity funds, yet the ISA Fund costs 1.04%. The marketplace offers numerous other products that cover international stock markets with the same breadth and charge "all-in" fees below what BOK and Cavanal Hill charge for the ISA Fund. Not surprisingly, lower-cost non-proprietary options have consistently outperformed BOK's proprietary fund, as shown in Illustration 10 below.

*Illustration 10*

| | Exp. % | 2017 5-Year | 2018 5-Year | 2019 5-Year | Other $200MM+ Plans |
|---|---|---|---|---|---|
| Vanguard Total International Stock Fund | 0.08% | 7.14% | *0.97%* | 5.88% | 1,040 |
| T. Rowe Price Overseas Stock Fund | 0.81% | *8.17%* | 0.66% | 5.87% | 20 |
| **BOK ISA Fund** | **1.04%** | **7.06%** | **-0.17%** | **5.14%** | **0** |

73.     BOK and Cavanal Hill have not demonstrated any special skill in managing the ISA fund to warrant retention of this fund in the Plan or payment of BOK's and Cavanal Hill's excessive fees for this fund.

### PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' ERISA VIOLATIONS

74.     Plaintiffs did not have actual knowledge of all material facts (including, among other things, the costs of the Plan's investments vis-à-vis comparable investments in similarly-sized plans, the performance of the Plan's investments vis-à-vis comparable investments in

similarly-sized plans, the differences between money market funds and stable value funds, the history of the Plan's investment menu, the actions of fiduciaries of other plans similar in size to the Plan, and the nature of all payments received by BOK and Cavanal Hill as a result of the Plan's investments) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed. Further, Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan or the Plan's investments because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

### CLASS ACTION ALLEGATIONS

75.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

76.     Plaintiffs assert their claims in Counts I - II on behalf of the following class:[22]

All participants and beneficiaries of the Plan whose Plan accounts held BOK's proprietary funds at any time on or after March 11, 2014, excluding Defendants, members of the Committee, any other persons with responsibility for the Plan's investment functions, persons with responsibility for the investment functions of the MAP CIT or Cavanal Hill Funds, and members of BOK's Board of Directors (or the Board of Directors of BOK's holding company).

---

[22] Plaintiffs reserve the right to revise their class definition, and to propose other or additional classes, in subsequent pleadings or their motion for class certification.

77.     <u>Numerosity</u>: The Class is so numerous that joinder of all Class members is impracticable. The Plan had more than 5,000 participants at all times during the applicable statutory period.

78.     <u>Typicality</u>:     Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are participants in the Plan who have suffered injuries as a result of Defendants' mismanagement of the Plan and the Plan's proprietary investments. Defendants' treatment of Plaintiffs is consistent with their treatment of other Class members with regard to the Plan and the Plan's investments. Defendants managed the Plan as a single entity, and therefore Defendants' imprudent decisions affected all Plan participants similarly.

79.     <u>Adequacy</u>:     Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and Plaintiffs have retained counsel experienced in complex class action litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

80.     <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including but not limited to:

    a.     Whether Defendants are fiduciaries of the Plan;

    b.     Whether Defendants breached their duty of loyalty by engaging in the conduct described herein;

    c.     Whether Defendants breached their duty of prudence by engaging in the conduct described herein;

    d.     Whether BOK breached its duty to monitor the Committee and its members;

    e.     The proper measure of monetary relief; and

f.      The proper form of equitable and injunctive relief.

81.     Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants.

82.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Plan participants, as a practical matter, would be dispositive of the interests of other Plan participants or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as removal of or replacement of particular Plan investments, removal or replacement of a Plan fiduciary, or appointment of an independent fiduciary, would be dispositive of non-party participants' interests. The accounting and restoration of property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

83.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct described in this Complaint has applied to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action

as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

**COUNT I**
**Breach of Duties of Loyalty and Prudence**
**29 U.S.C. § 1104(a)(1)(A)–(B)**

84.     Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

85.      29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan and in their selection, monitoring, and management of Plan investments.

86.     As described throughout this Complaint, Defendants breached their fiduciary duties with respect to the Plan by (among other things):

      a.    Retaining high-cost and poor performing proprietary funds;

      b.    Failing to manage the BOK target-date funds in a loyal and cost-conscious manner, as required of operators and advisers of collective investment trusts; and

      c.    Failing to investigate appropriate non-proprietary alternatives both as fiduciaries with respect to the Plan's investment menu and the underlying holdings of the MAP CIT funds.

87.     Based on the actions and omissions described above and elsewhere in this Complaint, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

88.     Based on the actions and omissions described above and elsewhere in this Complaint, Defendants also failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

89.     As a consequence of Defendants' breaches of their fiduciary duties, the Plan has suffered millions of dollars in losses.

90.     Pursuant to 29 U.S.C. § 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to make good to the Plan all losses resulting from Defendants' fiduciary breaches, and to disgorge all associated profits. In addition, the Plan and Plan participants are entitled to further equitable and injunctive relief to redress Defendants' fiduciary breaches.

91.     Each Defendant knowingly participated in each breach of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties; and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT II
### Failure to Monitor the Committee

92.     As alleged throughout the Complaint, the Committee is a fiduciary of the Plan.

93.     BOK is responsible for appointing and removing the members of the Committee.

94.     Given that BOK had responsibility to appoint and remove members of the Committee, BOK had a fiduciary responsibility to monitor the performance of the Committee and

its members, to ensure they were performing their duties lawfully and appropriately, in a manner

that was consistent with ERISA. *See* 29 C.F.R. § 2509.75-8, FR-17.

95.     A monitoring fiduciary must take prompt and effective action to protect the Plan

and its participants when its appointees are not meeting their fiduciary obligations under ERISA

or otherwise failing to carry out their duties lawfully and appropriately.

96.     BOK breached its fiduciary monitoring duties by, among other things:

    a.     Failing to monitor and evaluate the performance of the Committee and its members, or have a system in place for doing so, standing idly by as the Plan suffered substantial losses as a result of the imprudent and disloyal actions and omissions of the Committee;

    b.     failing to monitor the Committee's fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein;

    c.     failing to implement a system to avoid conflicts of interest that tainted the decisions made by the Committee;

    d.     failing to remove fiduciaries whose performance was inadequate for the reasons described above, to the detriment of the Plan and Plan participants' retirement savings; and

    e.     Tolerating the Committee's disloyal and imprudent actions because BOK was the beneficiary of those improper actions.

97.     As a consequence of the foregoing breaches of the duty to monitor, the Plan and

Plan participants have suffered millions of dollars in losses.

98.     Pursuant to 29 U.S.C. § 1109(a), 1132(a)(2), and 1132(a)(3), BOK is liable to

restore to the Plan all losses suffered as a result of BOK's failure to properly monitor the

Committee and its members and must disgorge all profits resulting from its failure to monitor. In

addition, the Plan and Plan participants are entitled to further equitable and injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, as representatives of the Class defined herein, and on behalf of

the Plan, pray for relief as follows:

a.　　A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

b.　　Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

c.　　A declaration that Defendants have breached their fiduciary duties in the manner described in the Complaint;

d.　　A declaration that BOK breached its duty to monitor other Plan fiduciaries;

e.　　An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties and other ERISA violations described above;

f.　　An order compelling Defendants BOK and Cavanal Hill to disgorge all profits received from the Plan;

g.　　An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

h.　　Other equitable relief to redress Defendants' unlawful practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan; removal or replacement of Plan fiduciaries deemed to have breached their fiduciary duties; and removal or replacement of improperly retained investment options;

i.　　An award of pre-judgment interest;

j.　　An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine;

k.　　Such other and further relief as the Court deems equitable and just.

Dated: March 12, 2020

**HAMMONS, HURST & ASSOCIATES**
By: s/Mark Hammons
Mark E. Hammons, Sr., OK Bar No. 3784
325 Dean A. McGee Ave.
Oklahoma City, OK  73102
Telephone: 405-235-6100
Facsimile: 405-235-6111
amberashby@hammonslaw.com

**NICHOLS KASTER, PLLP**
Kai H. Richter, MN Bar No. 0296545*
Paul J. Lukas, MN Bar No. 22084X*
Brock J. Specht, MN Bar No. 0388343*
Benjamin J. Bauer, MN Bar No. 0348853*
Christopher Theophillus Smith, MN Bar No. 0401091*
        * *pro hac vice* application forthcoming
4600 IDS Center
80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Facsimile: 612-338-4878
krichter@nka.com
lukas@nka.com
bspecht@nka.com
bbauer@nka.com
tsmith@nka.com

ATTORNEYS FOR PLAINTIFFS